**AMERICAN PRESIDENT LINES, LTD.,**
as owner of the S. S. PRESIDENT
GRANT, Libelant,

v.

The TOWBOAT SENECA, her engines,
etc., and the James McWilliams Blue
Line, Inc., Respondent-Claimant.

**UNITED STATES of America,**
Libelant,

v.

S. S. PRESIDENT GRANT, her engines,
etc., and American President Lines,
Ltd., Claimant-Respondent-Petitioner,

v.

TOWBOAT SENECA, her engines, etc.,
and James McWilliams Blue Line,
Inc., Impleaded Respondent.

Nos. 61 AD 1449, 65 AD 955.

United States District Court
S. D. New York.

Dec. 21, 1966.

Symmers, Fish & Warner, New York City, for American President Lines, Ltd. (William Warner, New York City, of counsel).

Macklin, Hanan & McKernan, New York City, for Towboat Seneca, etc., and the James McWilliams Blue Line, Inc. (Timothy A. Hanan, New York City, of counsel).

Robert M. Morgenthau, U. S. Atty., New York City, for United States (Louis

E. Greco, New York City, Attorney in Charge, Admiralty & Shipping Section, of counsel).

RYAN, District Judge.

There are two suits in the Admiralty before the Court for trial.

A libel has been filed by AMERICAN PRESIDENT LINES, LTD., as owner of the SS PRESIDENT GRANT against the Towboat SENECA and owner JAMES McWILLIAMS BLUE LINE INC., for damage to the propeller of the SS PRESIDENT GRANT (61 Admiralty 1449).

A libel has also been filed by the UNITED STATES OF AMERICA against the SS PRESIDENT GRANT and AMERICAN PRESIDENT LINES, LTD., in which the Towboat SENECA and JAMES McWILLIAMS BLUE LINE, INC., were impleaded for damages and statutory penalty (33 U.S.C. §§ 411, 412) resulting from the sinking of the Lighted Bell Buoy, Light List #1868, at the Chesapeake and Delaware Canal Junction on July 26, 1961 (65 Admiralty 955).

Both suits were consolidated by the Court at trial for all purposes. By stipulation, orally stated on the record, the claim of the Government was admitted by concession that the SS PRESIDENT GRANT on July 12, 1961 sustained some possible damage to her propeller, by striking and damaging the buoy in suit to the amount of $3,757.00 for which it was primarily liable and that it had incurred a statutory penalty of $500.00 for which judgment was to be entered in favor of the Government against the SS PRESIDENT GRANT and her owner without interest or costs. This left for trial only the issue as to the liability of the respective ships and owners.

The SS PRESIDENT GRANT is 465.25 feet long, 69.5 feet wide, and 33.9 feet deep to bulkhead deck, 29.3 feet maximum draft with 8500 SHP. She has one propeller, with right handed screw when turning ahead, of a diameter of 21.4 feet and pitch of 21.083 feet. Her maximum speed with engines on "full ahead" is 60 rpm maneuvering (or about eight knots); half ahead, 40 rpm maneuvering; slow ahead 20 rpm maneuvering.

The SS PRESIDENT GRANT, with its Master Leon S. Goltzer on the bridge, was proceeding from Baltimore to New York via the Chesapeake and Delaware Canal; the actual conning was done by Captain Robert G. MacIntyre, a licensed Delaware Bay and River and Chesapeake and Delaware Canal Pilot. The ship struck the buoy as she was exiting from the eastern end of the Canal, while under way into the Delaware River.

The Towboat SENECA is 89.2 feet long, 23 feet wide, and 11 feet deep; the forward part of the wheelhouse to the stem of the vessel is 15 feet 8 inches. The distance between the deck of the wheelhouse and the main deck is 2.3 feet (plus 4 inch portable platform upon which the navigator stands); and the distance from the waterline abeam the wheelhouse to the main deck is 3 feet 8 inches. She has a right handed screw when turning under speeds ahead. Her maximum speed full ahead is 7-7½ knots; half ahead 4 knots; and slow ahead 2½-3 knots. The SENECA's power in reverse is approximately 80% as compared with full power ahead, and it takes about 9 seconds for her propeller to move to full power astern from full ahead when full astern is ordered from the bridge.

The SENECA had a barge close along her port side attached by a head line, a tow line and a stern line. The barge was square ended, 1039 gross tons, 215.1 feet in length, 42.1 feet in breadth and 13.1 feet in depth. The SENECA was a tugboat designed for towing and her maneuverability was in no way affected by having the barge attached close to her port side.

Traffic through the canal is controlled through radio telephone by the tug patrol boat "Escort", which issues traffic instructions for vessels entering the canal. Both the SS PRESIDENT GRANT and the SENECA are equipped with radio telephone and both ships were in communication with the ESCORT; the

SENECA, at Pea Patch Island (which is north of the Canal) prior to the incident, concerning the order of her entry in to the canal, and the SS PRESIDENT GRANT after the incident to report her striking the buoy.

It is the contention of the SS PRESIDENT GRANT and her owner that at about 22.51 hours on July 12, 1961, she was exiting the eastern end of the Chesapeake and Delaware Canal into the Delaware River. The Towboat SENECA and her tow were observed to the south of the fairway channel and clear of it. At the time, the tug was showing a green sidelight and regulation white lights. Still showing the same sidelight, the tug and tow suddenly moved into the fairway. To avoid collision, the SS PRESIDENT GRANT came hard left and was forced to strike Junction Buoy Light List #1869. As a result of negligent crowding of the fairway by the tug, it is contended the buoy was sunk and the SS PRESIDENT GRANT incurred damage to her propeller.

It is the contention of the tug SENECA that she remained clear of the entrance channel of the canal and at no time did either the SENECA or her tow in any way crowd or embarrass the navigation of the SS PRESIDENT GRANT, which was on a collision course with the buoy.

The SENECA intended to proceed westbound through the canal. She reached waters in the vicinity of Reedy Island with barge in tow about 22.30 hours on July 12, 1961. Captain Churchill contacted the ESCORT for clearance to enter the canal and was informed that five ships were eastbound through the canal and that clearance for the SENECA to enter would be given after the first two had left the eastern end of the canal. The SS PRESIDENT GRANT was the second of these ships (the first exited and proceeded without later incident). After receipt of clearance advice, the SENECA and her tow proceeded to a ship's anchorage area which lies westward of the main Delaware River Channel and Reedy Point Range and to the south of the entrance channel leading to the canal, to await its turn and the passage of the two ships, the second of which was the SS PRESIDENT GRANT. There were two or three ships anchored in the anchorage area. The SENECA came to a position north of the stern of the ship anchored furthest to the north in the anchorage. She cut down the forward speed of her engines and planned to maintain only sufficient forward power to keep her position against the northwesterly 2 knot current in the area positioning her self in a southwesterly heading 50 to 75 feet off the stern of the anchored vessel. This was at about 22.45.

It was a dark but clear night; the visibility was good; the wind was light southerly; the tide was flood in a northwesterly direction of about 2 knots. While in the anchorage according to the Master, the SENECA had clear sight of canal traffic to a point in the vicinity of Biddle Point, which her Master testified he would not have seen had he been in or near the entrance of the canal because at that point the bridge blocks the view up the Canal. Although he had no occasion to check his time, he testified that he was in the anchorage as above described a total of 5 to 10 minutes, but that within a few minutes of his arrival, he sighted the lights of the SS PRESIDENT GRANT proceeding east through the Canal. It was the purpose of the SENECA to remain astern the anchored vessel while waiting for the SS PRESIDENT GRANT to exit from the Canal before the SENECA would drift northward to enter the canal by a broadside approach, all the while maintaining a southwest heading and stemming the tide. In this position, her green lights would remain showing to the traffic proceeding eastward and particularly to the SS PRESIDENT GRANT.

It is not disputed that both vessels were plainly visible to each other at all times and that both were displaying proper running lights.

The Master of the SENECA admitted, however, that he did not continuously

observe the progress of the SS PRESI-DENT GRANT because he was concerned with keeping offstern the anchored vessel, but that as the SS PRESIDENT GRANT was approaching the exit to the Canal and the buoy, she headed toward the SENECA and then swung to port, but that at the same time she passed him well north, giving him quite a berth and without any apparent difficulty. He did admit, however, that as she passed him to the north, she blew him two whistles to indicate a starboard passing to which he assented by replying, that she cleared the canal, that he then proceeded to enter it and that he knew nothing of the SS PRESIDENT GRANT's further progress or her striking the buoy since there was no reason to notice anything amiss once she had exited. At about 23.00 he testified he entered the canal.

The Master's testimony is inconsistent in several respects, among which is that although he admits the exchange of signals for a starboard passing, he has himself still positioned in a southwest heading approaching the entrance broadside and the SS PRESIDENT GRANT clearing him well to the north. But it is obvious that, if the SS PRESIDENT GRANT had cleared the SENECA as the Master described it and if the SENECA had been heading southwest in the anchorage just stemming the tide and not backing, there would have been no occasion for the exchange of signals. The inconsistency of the Master's testimony stems from the fact that he had no records with which to refresh his memory and that he had no memory of the events, because as he said nothing happened for him to remember, and that he was testifying as to his course and his movements from what his normal procedure would be in the circumstances and not from what he actually did but that which he assumed he did.

It is clear that whether the Master deliberately entered the canal prior to the exiting of the SS PRESIDENT GRANT whether by intent or because he miscalculated the speed of the SS PRESIDENT GRANT, or whether he permitted the SENECA to drift northwards too rapidly by failing to maintain sufficient power in her engines to stem the pull of the tide, the fact emerges that he did place the SENECA in the path of the oncoming SS PRESIDENT GRANT and thus forced the SS PRESIDENT GRANT to swerve to port with the result that she scraped the buoy. This was in direct contravention of the rules for proper seamanship on inland waters and in conflict with the express orders of the patrol boat ESCORT which had ordered the SENECA not to enter the canal until the SS PRESIDENT GRANT had completed her canal passage.

█ We find that the negligence on the part of the Captain of the SENECA in permitting the vessel to drift to a position where she blocked the exit of the Chesapeake and Delaware Canal created a dangerous situation. The SS PRESIDENT GRANT proceeding through the canal exit was confronted by the SENECA directly ahead of her; the situation was *in extremis*. But we find that this situation was contributed to by the inattention of the SS PRESIDENT GRANT in failing to anticipate and avert the obvious danger in which she was about to find herself.

The testimony of the Master of the SS PRESIDENT GRANT as well as that of her Delaware River Pilot was that the SENECA was at all times visible to the SS PRESIDENT GRANT; that when she was first sighted at approximately 22.51 she was 800 yards away, well off the SS PRESIDENT GRANT's starboard and when the SS PRESIDENT GRANT was abeam Reedy Point Breakwater—about 800 feet from the exit of the Canal; that the SENECA at that time did not appear to be moving; but that she then started drifting northward so that at 22.54 when the SS PRESIDENT GRANT was abeam and 100 feet south of the buoy, the SENECA was only 600 yards away and that she continued to drift northward until suddenly at 22.55, she was but 200 yards away from the SS PRESIDENT GRANT directly across her path. Throughout this time the

green lights and the movement of the SENECA were visible, sinch she kept her heading southwest. They further testified that throughout this time—4 minutes—the SENECA was visible to the Master, the pilot and the Chief Mate of the SS PRESIDENT GRANT. In her passage through the canal, the testimony was that the SS PRESIDENT GRANT was doing about 8 knots which was increased to 9 or 10 knots as she approached the exit—a speed claimed to be necessary to combat the tide. At that point the SENECA was but 200 yards to her right and the SS PRESIDENT GRANT sounded two blasts for a starboard passing which were returned by the SENECA; the buoy was less than 100 feet off the port of the SS PRESIDENT GRANT and, in order to clear the SENECA, she was forced to make a hard left, scraping and sinking the buoy. The testimony that the SENECA was first sighted 800 yards away, then 600 and then 200 and that she was moving northward with her green lights showing for a period of 4 minutes, is difficult to reconcile with the testimony that the SENECA moved suddenly into the path of the SS PRESIDENT GRANT, placing her in a perilous situation.

■ But there is no question about the fact that she was placed in a perilous situation; there was then no way of going around the north side of the buoy to avert the collision, but certainly the movement northward of green lights, which meant that the SENECA should have been moving southward and that she was backing into the path of the SS PRESIDENT GRANT, was enough to put the SS PRESIDENT GRANT on notice that action was required to avert a dangerous situation. She could or should have sounded blasts of danger or warning, she could or should have slowed down or stopped her engines to determine what the SENECA was doing, or she might have speeded up in order to clear the buoy prior to the arrival of the SENECA in her starboard. She did none of these, but merely sounded an ordinary passing signal.

We conclude, therefore, that while the SENECA created the dangerous situation through her negligence, there was opportunity for the SS PRESIDENT GRANT to avert its effects and that she did nothing so that her crowding and hitting of the buoy was contributed to by her negligence and inattention in failing to take action in time.

■ In order to absolve the SENECA from all fault, counsel sought to establish through expert testimony that the SS PRESIDENT GRANT was traveling on a collision course with the buoy so that, irrespective of any action on the part of the SENECA, if she continued on her course, the SS PRESIDENT GRANT would have collided with the buoy. The expert on navigation had not traveled through the canal in 16 years, prior to that had done so only 6 times, and he had never taken a vessel the size of the SS PRESIDENT GRANT through the canal. In any event, his testimony was that, under the assumed conditions of wind, tide and respective positions of the two vessels, the SENECA could not in the space of 4 minutes have drifted 600 yards to a spot directly ahead of the SS PRESIDENT GRANT at 200 yards unless she was backing down on her engines. In addition, he testified that the SS PRESIDENT GRANT was not maintaining a course and speed sufficient to clear the buoy irrespective of whether or not the SENECA blocked her path because, under the current and set conditions, she was too far to the left to avoid striking it. His testimony must be discounted for the reason that what he did in computing the course of the SS PRESIDENT GRANT was to use a speed other than that which was testified to and recorded by her master and pilot so that one of the basic elements necessary to compute the course was not in evidence.

■ Captain Goltzer had testified, and the log so recorded it, that the speed of the SS PRESIDENT GRANT over the ground was 8 knots; that she was proceeding on a course of 082 degrees when exiting the Chesapeake and Delaware Canal. Captain MacIntyre, the Chesa-

peake and Delaware Canal Pilot, had testified that the current was 1.98 knots in a direction of 355 degrees true, the effect of which would be to swing the bow of the SS PRESIDENT GRANT to the north. The expert, however, testified that had the SS PRESIDENT GRANT been traveling at the speed of 8 knots or more, as was also the testimony, she would have well cleared the exit of the canal before the SENECA reached her path—so that there would have been no occasion for a crowding or a collision. The speed he estimated the SS PRESIDENT GRANT would have to have been doing in order to meet the SENECA in its path, could have been about 5.3 knots and it was this speed he used to compute its course. He attempted to explain the contradictory entry in the SS PRESIDENT GRANT's log as the result of confusion in the excitement. He admitted on cross examination that time, distance and speed are basic elements in plotting a course, and that if one of these changed, his computations would mean nothing. Having changed the speed of the SS PRESIDENT GRANT in order to reach his computation of a collision course, his testimony must be discounted. In addition, in computing this course and the relative movement of the SENECA, he did not consider the effect of the wind on the drift of the SENECA and her tow, so that, if the distance of the SENECA were other than that assumed—that is 800 yards away—the computation of the SS PRESIDENT GRANT's course would also have to be changed. For these reasons, his testimony as to the SS PRESIDENT GRANT's course has no weight and we find that there is no evidence that the SS PRESIDENT GRANT was on a collision course with the buoy.

We conclude that both vessels are to blame in the collision of the SS PRESIDENT GRANT with the buoy; the SENECA for negligently moving into the path of the SS PRESIDENT GRANT and the SS PRESIDENT GRANT for failing to take action to avert the situation of danger which was obviously developing and which, with the exercise of care, it should have anticipated and prepared for by appropriate action.

Settle decree in conformity with these findings and conclusions.